**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| NICHOLAS ALLEN TIPTON, | ) | CASE NO. 1:25-CV-1917 |
| | ) | |
| Plaintiff, | ) | JUDGE CHARLES ESQUE FLEMING |
| | ) | UNITED STATES DISTRICT JUDGE |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL | ) | JENNIFER DOWDELL ARMSTRONG |
| SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.      INTRODUCTION

The Commissioner of Social Security denied Plaintiff Nicholas Allen Tipton's application

for a period of disability, Disability Insurance Benefits (DIB), and Supplemental Security Income

(SSI). Mr. Tipton seeks judicial review of that decision pursuant to 42 U.S.C. §§ 405(g) and

1383(c). (Compl., ECF No. 1.) This matter is before me pursuant to Local Rule 72.2(b). (*See* ECF

non-document entry dated Sept. 11, 2025.)

For the reasons set forth below, I RECOMMEND that the Court AFFIRM the

Commissioner's final decision.

## II.     PROCEDURAL HISTORY

Mr. Tipton applied to the Social Security Administration (SSA) in February 2023, seeking

DIB, and, in May 2023, he applied for SSI. (Tr. 248, 250.)[1] He claimed that he became disabled

on January 1, 2020. (*Id.*) He identified 10 allegedly disabling conditions: (1) "shoulder surgery

(left) 10/2020"; (2) type I diabetes; (3) neuropathy; (4) severe memory loss; (5) gastrointestinal

---

[1] The administrative transcript appears at ECF No. 5. I will refer to pages within the transcript by identifying the Bates number printed on the bottom right-hand corner of the page (e.g., "Tr. 32"). I will refer to other documents in the record by their CM/ECF document numbers (e.g., "ECF No. 6") and page-identification numbers (e.g., "PageID# 2021").

1

issues; (6) anxiety; (7) high blood pressure; (8) "pre-cirrhosis of the liver"; (9) hypothyroidism; and (10) diabetic retinopathy in both eyes. (Tr. 289.)

The SSA denied Mr. Tipton's application initially and upon reconsideration. (Tr. 101, 126.) Mr. Tipton requested a hearing before an administrative law judge (ALJ). (Tr. 169.) His counsel submitted a letter–brief in advance of the hearing. (Tr. 365–68.) The ALJ held a hearing on June 26, 2024, at which Mr. Tipton was represented by counsel. (Tr. 39–67.) Mr. Tipton testified, as did an independent vocational expert (VE). (*Id.*)

On July 26, 2024, the ALJ issued a written decision finding that Mr. Tipton is not disabled. (Tr. 14–38.) Mr. Tipton requested review of the ALJ's decision. (Tr. 243.) His counsel submitted a brief identifying alleged errors in the decision. (Tr. 246–47.)

On July 14, 2025, the Appeals Council denied review, rendering the ALJ's decision final. (Tr. 1.)

On September 11, 2025, Mr. Tipton filed his Complaint, challenging the Commissioner's final decision that he is not disabled. (ECF No. 1.) Mr. Tipton asserts the following assignment of error for review:

> Remand is required for the ALJ's errors evaluating the opinion of Plaintiff's primary care physician assistant.

(Pl.'s Merit Br. at 11, ECF No. 6, PageID# 2021.)

## III. BACKGROUND

### A. **Personal, Educational, and Vocational Experience**

Mr. Tipton was born in September 1984 and was 38 years old on the date of his application. (Tr. 248.) He graduated from high school and completed some college courses. (Tr. 45.) He lives with his wife and two teenaged stepchildren. (Tr. 44.) He has a driver's license, but he does not

2

have access to a car. (Tr. 44–45.) He does not go out very often; his mother will drive him to appointments. (*Id.*)

Mr. Tipton previously worked for a traveling fair attraction, a "candy maze." (*See* Tr. 46.) He would travel with the attraction to various state fairs; he would sit at the front of the maze and hand out candy baskets. (*Id.*) He performed that work for about eight weeks, three to four hours per day. (Tr. 47.) Prior to that work, Mr. Tipton had worked full-time for a plumbing manufacturer until around September 2020. (*Id.*) Mr. Tipton has other past work as an image editor and as an assembly worker. (Tr. 48–49, 291.)

### B.     Previous Application for Benefits

Mr. Tipton previously filed an application for DIB and SSI on February 23, 2016. (Tr. 71.) On April 18, 2019, an ALJ issued a written decision finding that Mr. Tipton was not disabled. (Tr. 68–83.) He has several, more remote previous applications for benefits. (Tr. 285–86.)

### C.     Function Reports

Mr. Tipton completed a function report on March 28, 2023. (Tr. 316.) He identified that he has diabetes and low blood sugar "lead[s] to seizures." (Tr. 309.) He wrote that he has depression that keeps him from getting out of bed or taking care of himself. (*Id.*) He said he had anxiety attacks that leave him "paralyzed with fear." (*Id.*) And he wrote that diabetic neuropathy causes "extreme pain" in his legs and feet. (*Id.*)

On a typical day, he will try to wake up before noon and make his way to the living room. (Tr. 310.) If his family is home, he will eat lunch; if not, he will wait until dinner. (*Id.*) He takes his medications and then tries to complete his physical therapy exercises with his arms and legs. (*Id.*) He will eat dinner, take his second set of medications, and then "still usually have panic attacks until around 1 or 2 a.m." (*Id.*) Sometimes he cannot sleep at all. (*Id.*) His wife and stepchildren help feed him and care for their family's dogs. (*Id.*)

3

Mr. Tipton described that his depression makes it difficult for him to dress himself in clean clothes or doing "basic hygiene" for himself. (*Id.*) He only showers "for emergencies," and he will go without eating unless he is reminded. (*Id.*) He needs help getting to the bathroom when his neuropathy is bad. (*Id.*)

Mr. Tipton can prepare microwave meals "if [he is] desperate" and home alone; he estimated that he does so about once a week. (Tr. 311.) He used to cook well, but he does not cook anymore. (*See id.*) Mr. Tipton folds laundry with his wife. (*Id.*) When he is able to stand, he can do dishes. (*Id.*) He works on these chores for an hour or two at a time. (*Id.*)

Mr. Tipton goes outside four to five times a month to walk, when he can. (Tr. 312.) But if his neuropathy pain is bad, it hurts to walk and he can fall. (*Id.*) He can drive short distances, but only rarely when his pain is manageable. (*Id.*) He shops for groceries online around once or twice a month when his wife is not able to do so. He will ride with her to the grocery store, but he usually stays in the car. (*Id.*)

Mr. Tipton has trouble focusing when his blood sugar is low. (*See id.*) But he is able to read, watch television, and listen to the radio. (Tr. 313.) He cannot read for long periods, so he only reads two or three times a month. (*Id.*) He speaks to a friend on the phone or through text messages once or twice every few months. (*Id.*) He watches his stepchild play sports once or twice a month. (*Id.*)

Mr. Tipton estimated that he can lift 20 pounds and walk 50 yards at a time. (Tr. 314.) He cannot squat, it hurts to bend to tie his shoes, and he cannot kneel or climb stairs without help. (*Id.*) When his blood sugar is low, he cannot talk or remember things. (*Id.*) He cannot complete tasks when his anxiety is high. (*Id.*) But he gets along well with authority figures. (*Id.*) He handles stress

and changes to his routine "very badly," explaining that change "paralyzes" him because he fears "it will lead to more bad things happening." (Tr. 315.)

### D.      Relevant Hearing Testimony

#### 1.      Mr. Tipton's Testimony

Mr. Tipton had surgery on his left shoulder in the fall of 2021; he has found that his range of motion with the shoulder remains "severely limited." (Tr. 50–51.) He cannot lift objects to eye level without pain. (*Id.*) His right shoulder is similarly limited, and it is "due to be scheduled" for surgery. (*Id.*)

Mr. Tipton described that he had been a "depressed husk" since his hospitalization in December 2023. (*See* Tr. 51.) He finds himself sitting around all day. (*Id.*) His family has two dogs, but his stepchildren primarily take care of them. (Tr. 51–52.) He has to be reminded to get up and make himself something to eat. (*See* Tr. 52.) He will try to sit outside or watch television, but his ability to be alone is affected by concerns that he will have "a low blood sugar episode." (*See id.*) He estimated that he has four or five such episodes per week. (Tr. 52–53.) He takes his medication as prescribed. (Tr. 53.)

Mr. Tipton's anxiety and depression will "flare up," such that he has a panic attack or a depressive episode where he has trouble getting out of bed. (*Id.*)

Mr. Tipton does not do any laundry and does not go grocery shopping. (Tr. 54.) He has to be reminded to see to his self-care. (*Id.*)

Mr. Tipton testified that he has diabetic retinopathy and had eye surgery in 2017 and 2018. (*Id.*) He finds that he still has "floaters" occasionally. (Tr. 55.) His diabetes is such that he has trouble walking and has a "bad memory." (*Id.*) When he goes outside on a hot day to walk, he finds that his blood sugar drops precipitously. (*Id.*) He experiences diabetic retinopathy in his left foot and thigh. (*Id.*) When his sugar drops, he "can't really think"; he will become disoriented and finds

that he feels lost. (Tr. 57.) Once he takes medication or receives help, it takes him about an hour to recover from one of these episodes. (*Id.*)

Mr. Tipton has back pain and finds that his range of motion without pain is limited. (Tr. 55–56.) He physically cannot reach overhead, with either arm. (Tr. 56.) He is able to reach in front of himself, but doing so causes pain in the right shoulder. (*Id.*) He cannot hold his left arm up for very long. (*Id.*) Physical therapy has helped with the left arm, but not sufficiently. (*See id.*)

Mr. Tipton estimated that he can stand for only a minute or two at a time, after which his legs begin to shake and move. (Tr. 57.) He estimated that he can walk for around 20 to 25 feet before needing to stop and rest. (Tr. 58.) He cannot lift more than 10 pounds without feeling a "giant leap in pain." (*Id.*) He believes he would need to change positions after sitting for five minutes, but he said this was more out of anxiety than physical discomfort. (*Id.*)

Mr. Tipton described a period over the winter when he was having relationship strains; he had difficulty getting up from bed and described suicidal thoughts. (*See* Tr. 59.) Sometimes he has an anxiety attack, lasting between one and three hours. (*Id.*)

### 2. *Vocational Expert's Testimony*

Diane Nayhouse testified as a vocational expert ("VE") at the hearing. (Tr. 60.) The VE characterized Mr. Tipton's past work as that of a molder of toilet parts (DOT 556.687-022), photo finish photographer (DOT 143.382-014), and hand assembler (DOT 721.684-022). (Tr. 61–62.)

The ALJ asked the VE to assume that a hypothetical person with Mr. Tipton's age, education, and work experience was limited to work at the light exertional level with several additional limitations. (Tr. 62–63.) Specifically, the person could occasionally lift and carry up to 20 pounds and frequently up to 10 pounds. (*Id.*) They would be able to push and pull with the upper extremities the same as they can lift and carry, but they would be limited to frequent pushing

6

and pulling with the lower extremities. (*Id.*) They would be able to stand or walk for four hours and sit for six hours in a normal workday. (*Id.*) They can occasionally climb ramps and stairs but can never climb ladders, ropes, or scaffolds. (*Id.*) They can occasionally balance, stoop, kneel, crouch, and crawl. (*Id.*) They can occasionally reach overhead with the upper extremities. (*Id.*) They must avoid concentrated exposure to vibration and may never work at unprotected heights or around dangerous or heavy machinery. (*Id.*) They can never drive a commercial motor vehicle. (*Id.*)

The ALJ asked the VE to further limit the person to simple routine tasks and semi-complex routine tasks in an environment that does not involve fast-paced work or requirements to meet a specific production quota. (*Id.*) Any changes in the work procedure must be occasional and explained in advance. (*Id.*)

The VE testified that such a person could not perform Mr. Tipton's past relevant work but could perform the work of a merchandise marker (DOT 209.587-034), small product assembler (DOT 706.684-022), or routing clerk (DOT 222.687-022). (Tr. 63.)

Mr. Tipton's counsel asked the VE to further limit the hypothetical person to occasionally reaching in all directions, bilaterally, and further limit them to only occasional interaction with supervisors, coworkers, and the public. (Tr. 64.) The VE confirmed that the additional reaching restriction would be work-preclusive. (*Id.*) But the VE testified that all the jobs she identified should involve no more than occasional interaction with supervisors. (*Id.*)

Counsel next asked the VE to consider the effect if the individual was not able to sit, stand, or walk in combination for an eight-hour workday. (Tr. 64–65.) The VE testified that no work would be available to a person so limited. (*Id.*) But the VE testified that around 50 percent of employers would offer some kind of sit-stand option. (*Id.*)

7

The VE testified that employers will tolerate one absence per month on average. (Tr. 65.)

**E.**     **State Agency Consultants**

A disability examiner (Quasia Dumas), a physician (Lisa Green-Hill, D.O.), and a psychologist (Larry Kravitz, Psy.D.) reviewed Mr. Tipton's claim at the initial review level. (Tr. 88–114.)

Dr. Kravitz found that Mr. Tipton had a mild impairment with respect to his ability to interact with others and a moderate limitation with respect to his ability to adapt or manage himself and to concentrate, persist, and maintain pace. (Tr. 95.) Dr. Kravitz concluded that there was "some support" in the record evidence for Mr. Tipton's mental health allegations, but "severity is not to the degree alleged." (Tr. 96.) He opined that Mr. Tipton could concentrate, persist, and maintain pace to carry out simple routine tasks and semi-complex (3–4 step) routines in a structured and predictable work setting. (Tr. 100.) He only found mild social interaction limitations, with no resulting functional limitation. (*Id.*) He wrote that Mr. Tipton remained able to perform work related tasks in a setting with occasional changes that are explained in advance. (*Id.*)

Dr. Green-Hill noted that the evidence supported some decreased range of motion in the shoulder, but Mr. Tipton's strength remained intact. (Tr. 96.) Dr. Green-Hill limited Mr. Tipton to occasionally pushing and pulling up to 20 pounds and frequently up to 10 pounds with the upper extremities. (Tr. 97.) She limited him to frequently pushing and fulling in the lower extremities. (*Id.*) She opined that he could stand or walk for four hours and sit for six hours in a normal workday. (*Id.*) She wrote that he should avoid ladders, ropes, and scaffolds but could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. (*Id.*) She opined that he had no limitations in his ability to handle, finger, or feel, but was limited in his ability to reach overhead and in front on the right side. (Tr. 97–98.) She wrote that he should avoid concentrated exposure to vibration due to decreased sensation in his lower extremities. (Tr. 98.)

Based on these opinions, the consultants concluded that Mr. Tipton could perform the work of a "stuffer" (DOT 731.685-014), "lens block gauger" (DOT 716.687-030), or "lens inserter" (DOT 713.687-026) and was not disabled. (Tr. 101.)

In a letter to Mr. Tipton explaining this decision, the Agency wrote that he was limited to sedentary activity but was capable of understanding and carrying out simple and multistep tasks in a work setting. (Tr. 146.)

A disability examiner (Melinda Girscht), physician (Steve McKee, M.D.), and psychologist (Aracelis Rivera Castro, Psy.D.) reviewed Mr. Tipton's claim at the reconsideration level. (Tr. 112–129.)

Dr. Rivera Castro concluded that the initial level findings were "reasonable" but required adjustment due to additional medical evidence added to the file at the reconsideration level. (Tr. 125.) Specifically, she opined that Mr. Tipton does have moderate social interaction limitations, such that he can interact with others only "superficially." (Tr. 124.) He should work in a setting where a supervisor is available to occasionally redirect him in his work. (*Id.*)

Even with these additional limitations, the consultants determined that Mr. Tipton remained capable of performing the work identified at the initial level and was not disabled. (Tr. 126.)

In a letter to Mr. Tipton explaining this decision, the Agency wrote that his conditions prevent prolonged standing and walking, but he would be able to stand or walk for four hours and sit for six hours in normal workday and perform light lifting. (Tr. 156.)

F.     **Relevant Medical Evidence**

Mr. Tipton saw a psychiatrist on January 7, 2020, and reported that since he started taking venlafaxine he was no longer having negative thoughts and no longer feeling depression; it was the "best he has felt in years." (Tr. 413.)

He presented to a physician assistant on January 30, 2020, complaining of tenderness in the right thumb; he had undergone an injection in July 2019, which helped until around November 2019. (*See* Tr. 382.) He received another injection and was advised that if the injection did not provide relief after two months, they might consider surgery. (*See id.*)

Mr. Tipton followed up with Thomas Zuesi, D.O., on February 5, 2020, for reevaluation of his left shoulder. (Tr. 383.) He said an injection in December 2019 had provided relief for only two days, and he complained of pain and weakness when reaching his hand overhead or lifting overhead. (*Id.*) On examination, there was a positive O'Brien's test and Neer's test with slightly decreased range of motion for abduction and internal rotation. (Tr. 384.) Dr. Zuesi ordered MRI imaging to diagnose a potential labral tear or rotator cuff tear, or potential developing adhesive capsulitis. (*Id.*) Mr. Tipton was recommended to continue range-of-motion exercises to prevent stiffness. (*Id.*)

Mr. Tipton followed up on April 10, 2020. (Tr. 385.) He reported "considerable pain" and said the pain made it hard to sleep. (*Id.*) He was able to rotate his neck 70 degrees without pain. (*Id.*) His shoulder examination was materially unchanged. (*Id.*) In reviewing the MRI imaging, Dr. Zuesi noted a labral tear that "may be very amenable to surgical intervention" once such surgeries resumed during the COVID pandemic. (*See id.*) Until then, he was instructed to use acetaminophen for mild pain and tramadol for breakthrough pain. (*Id.*)

Mr. Tipton saw little benefit from the tramadol and reported side effects. (Tr. 387.) On April 17, 2020, Dr. Zuesi prescribed Norco, but advised Mr. Tipton to take it "vary sparingly." (*Id.*) The medication helped Mr. Tipton fall asleep at night, but his shoulder continued getting worse pending the surgery, such that Dr. Zuesi was concerned about adhesive capsulitis. (Tr. 388–89.)

10

Mr. Tipton was able to be evaluated by a surgeon on May 12, 2020. (Tr. 390.) The surgeon found that Mr. Tipton "clearly doesn't have shoulder instability" but does have left shoulder adhesive capsulitis. There was reduced range of motion on examination. (Tr. 393.) He was given an injection and told to follow up in two months. (*Id.*)

On the same day, Mr. Tipton participated in a telephone visit for pharmacological management. (Tr. 416.) He reported that he felt the venlafaxine was working well, but he had run out of it and was out of town. (Tr. 417.) He had not taken any medication for several days and was feeling withdrawal symptoms, including irritability. (*Id.*) He denied feelings of depression or anxiety, and he said his energy and motivation were improved. (*Id.*) He denied panic attacks. (*Id.*) His medication was refilled. (Tr. 418.)

Mr. Tipton was evaluated for physical therapy on May 13, 2020. (Tr. 828.) He reported pain of a nine out of ten in the shoulder. (*Id.*) He began physical therapy in May 2020. (Tr. 815, 820, 824, 828.)

On June 1, 2020, Mr. Tipton told Dr. Zuesi that the surgeon's injection had made his pain worse. (Tr. 396.) Dr. Zuesi told him this was reflective of a "steroid flare." (*Id.*) The doctor noted that physical therapy seemed to be helping his active and passive ranges of motion, but he had not gotten back to normal. (*Id.*) But Mr. Tipton said he wanted to stop therapy in favor of home exercises and engage a different surgeon for a second opinion as to whether surgery was warranted. (*Id.*)

Mr. Tipton followed up with a nurse practitioner on June 24, 2020. (Tr. 795.) On examination, he had positive Hawkin's, Neer's, O'Brien's, Speed's, and Yergason's tests. (Tr. 797–98.) There was tenderness in the acromioclavicular joint and bicep. (*Id.*) The nurse practitioner agreed that he should proceed with therapy exercises in lieu of surgery, but she offered an

arthroscopic procedure. (Tr. 798.)  Mr. Tipton engaged in another session of physical therapy and ultimately, on September 28, 2020, agreed to undergo the arthroscopic surgery. (Tr. 800, 794.)

The surgery was performed on October 21, 2020. (Tr. 786.) Postoperative physical therapy was tolerated well, although he continued to show guarding. (Tr. 758–60.) His pain was decreasing day by day. (Tr. 757.) He continued to follow with rehabilitation. (Tr. 679–711; 714–53.)

Mr. Tipton followed up with his psychiatrist in November 2020, reporting that he had misplaced his venlafaxine and had not been taking it. (Tr. 421.) Off the medication, he had been feeling worse but had not had panic attacks, crying spells, or suicidal ideation. (*Id.*) Mr. Tipton was started on bupropion. (Tr. 422.) He was calm and collaborative on examination, with normal pitch and volume of voice, a "so so" mood, and a semi-dysthymic mood. (Tr. 421.)

At a postsurgical appointment on December 14, 2020, Mr. Tipton reported that his shoulder gets stiff "every now and then" but that he was "doing okay." (Tr. 712.) He had no pain at a rehabilitation appointment on January 22, 2021. (Tr. 679; *see also* Tr. 685 (same on January 15)). On January 29, 2021, he said the shoulder was "doing well" and denied pain, although he had some soreness at night. (Tr. 677.)

On February 19, 2021, at a rehabilitation appointment, he reported that he had been shoveling snow and felt "strained," although there was no real pain. (Tr. 662.) He reported his pain as a one out of ten. (*Id.*)

On March 8, 2021, it was noted that Mr. Tipton continued to make "fair progress" with improved range of motion and strength, although his shoulder stiffness was still limiting "his ease with ADLs." (Tr. 661.)

Mr. Tipton returned to the psychiatrist on September 30, 2021. (Tr. 424.) The psychiatrist noted that he had not been to the office in almost a year. (*Id.*) Mr. Tipton reported that his bupropion

had been helpful, but he had run out and never made a follow up appointment. (*Id.*) He said he had been having difficulty doing things, racing thoughts, and low appetite. (*Id.*) He denied panic attacks, crying spells, or suicidal ideation. (*Id.*) He was restarted on his medication. (Tr. 425.)

Mr. Tipton complained of pain with walking and wearing shoes in October 2021 (Tr. 461), and ultimately he was fitted for orthotics in November 2021. (Tr. 466.)

Mr. Tipton followed up with the psychiatrist on December 9, 2021. (Tr. 471.) He reported that he had stopped taking the bupropion because he "did not tolerate it." (*Id.*) Off the medication, he felt that he was not doing well and complained of low energy and motivation, racing thoughts, and panic attacks. (*Id.*) He was started on amitriptyline. (Tr. 472.)

Mr. Tipton consulted with Dr. Wisner on August 19, 2022, complaining of mild (3/10) low back pain. (Tr. 614.) Mr. Tipton said the pain was worse during the day and was aggravated by bending, changing position, and sitting. (*Id.*) He said that home exercises had provided some relief. (*Id.*) On examination, there was normal range of motion generally and normal range of motion in the cervical and low back specifically. (Tr. 617.) But there was a spasm noted in the right lumbar musculature, with tenderness and bony tenderness present. (*Id.*) He was started on a muscle relaxant and a non-steroidal anti-inflammatory drug. (Tr. 618.)

Mr. Tipton followed up with a nurse practitioner regarding right shoulder pain on August 29, 2022. (Tr. 608.) He said the pain started six months ago and he has difficulty reaching overhead or behind his back. (*Id.*) He received a subacromial injection and was referred to physical therapy. (Tr. 609.)

Mr. Tipton returned to the psychiatrist in October 2022, reporting that he had been in a "family feud" and saying that he was dealing with multiple stressors at home with which he was having difficulty coping. (Tr. 475.) He had been noncompliant with his medication and had not

13

been to a follow up appointment for several months. (*Id.*) He complained of worsening anxiety, racing thoughts, and trouble sleeping, but he denied crying spells. (*Id.*) He remained calm and collaborative on examination, with normal pitch and volume. (*Id.*) He was provided with psychotherapy and recommended to marriage counseling. (Tr. 476.)

Mr. Tipton found some initial relief from the right shoulder injection, but as of November 17, 2022, he was complaining of worsening pain that was interfering with his daily activities. (Tr. 585.) On examination, Hawkins's test and Neer's sign were positive and crossbody adduction was positive. (*Id.*) He was given another injection, referred to physical therapy, and instructed to use acetaminophen as needed. (Tr. 586.)

Mr. Tipton followed up on February 20, 2023. (Tr. 561.) He said the injection had helped for six weeks and his pain, range of motion, and discomfort continue to improve. (*Id.*) But he said that he continued to have difficulty with range of motion and was unable to perform all his daily activities. (*Id.*) He received another injection and was given physical therapy exercises to perform at home. (Tr. 562.)

X-ray imaging of the right shoulder was negative. (Tr. 966.) In June 2023, as his pain was continuing to improve, he did not receive an injection. (*Id.*) The injection provided relief for six weeks, but in July 2023 he "felt a pop" in his shoulder and had increased pain and limited range of motion. (Tr. 953.) He received another injection. (Tr. 964.)

Mr. Tipton returned to the psychiatrist on September 26, 2023. (Tr. 1002.) He had not been seen in several months and had not been compliant with medication. (*Id.*) He reported depression and crying spells and identified a significant stressor, the death of a family member. (*Id.*) He was started on a new antidepressant. (Tr. 1003.)

On December 28, 2023, Plaintiff was hospitalized for worsening depressive symptoms, delusions, and new onset suicidal ideation. (Tr. 1145.) He reported delusions of people saying and doing things they have not, but denied hallucinations. (Tr. 1146.) He was briefly hospitalized in the inpatient psychiatric unit, where he was restarted on paroxetine and ultimately discharged. (Tr. 1146.)

He followed up with his psychiatrist on January 18, 2024, noting that his new medication had been helpful, and he wished to continue it. (Tr. 1887–88.) He was feeling more motivated and able to do his daily activities, his anxiety symptoms had stabilized, and his appetite had improved. (*Id.*)

On January 23, 2024, Mr. Tipton underwent a consultative psychological examination, with Sudhir Dubey, PsyD. (Tr. 1005–11.) He endorsed depression, sleep changes, past suicidal thoughts, and anxiety, with symptoms including racing thoughts and "paranoia." (Tr. 1006.) He denied crying spells and said he "feels okay about himself." (*Id.*) Dr. Dubey identified Mr. Tipton's prognosis as "guarded." (Tr. 1008.) It was noted he could care for himself and his pets, do basic paperwork, and drive, but he required help in all other areas due to mood problems. (*Id.*) Dr. Dubey opined that he could follow simple instructions independently and multi-step instructions with close supervision "and given time." (Tr. 1010.) He could maintain attention and concentration. (*Id.*) He would have "some difficulties" with supervisors or coworkers, if his mood issues "flare [] up." (Tr. 1011.) In addition, "[u]nder stressful circumstances, his mood related issues would worsen, which would affect his performance." (*Id.*) But Dr. Dubey noted that in the somewhat stressful situation of interacting with a new doctor in a new office, Mr. Tipton was generally calm and stable. (*Id.*)

Mr. Tipton met with a therapist on February 29, 2024. (Tr. 1883.)

He followed up with his psychiatrist in April 2024, reporting that he was feeling depressed because his marriage was "falling apart." (Tr. 1880.) But he continued to report a good response to his medication and wanted to continue it. (*Id.*) He said his anxiety was stabilized, and on examination he was calm and collaborative, speaking with normal pitch and volume, albeit with a depressed mood. (Tr. 1881.)

On July 10, 2024, Mr. Wisner completed a residual functional capacity questionnaire at the request of Mr. Tipton's counsel. (Tr. 1947–51.) He opined that Mr. Tipton would be absent around four days per month, had disabling postural and manipulative limitations, and could rarely handle even a low stress job. (*See id.*) Because that opinion is the subject of this appeal, it is discussed in more detail further below.

## IV.     THE ALJ'S DECISION

The ALJ found that Mr. Tipton meets the insured status requirements of the Social Security Act through March 31, 2026. (Tr. 20.) She further found that he has not engaged in substantial gainful activity since January 1, 2020, the alleged onset date. (*Id.*)

The ALJ next determined that Mr. Tipton had the following severe impairments: (1) type I diabetes mellitus; (2) diabetic neuropathy; (3) left shoulder labral tear, status post repair; (4) right shoulder adhesive capsulitis; (5) obesity; (6) depressive disorder; and (7) generalized anxiety disorder. (Tr. 21.)

The ALJ determined that none of Mr. Tipton's impairments, whether considered singly or in combination, met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (*Id.*)

The ALJ determined that Mr. Tipton had the residual functional capacity ("RFC") to perform work at the light exertional level with certain additional limitations. (Tr. 24.) Specifically, Mr. Tipton can stand or walk for four hours and sit for six hours in an eight-hour workday with

16

normal breaks. (*Id.*) He can occasionally lift and carry up to 20 pounds and frequently lift and carry up to 10 pounds. (*Id.*) He is able to occasionally push or pull up to 20 pounds with the upper extremities, and frequently up to 10 pounds. (*Id.*) He can frequently push or pull with the lower extremities. (*Id.*) He can occasionally climb ramps and stairs but can never climb ladders, ropes, or scaffolds. (*Id.*) He can occasionally balance, stoop, kneel, crouch, and crawl. (*Id.*) He can occasionally reach overhead with the right and left upper extremities. (*Id.*) He must avoid concentrated exposure to vibration and cannot work in unprotected heights or around dangerous machinery. (*Id.*) He cannot drive commercially. (*Id.*)

With respect to non-exertional limitations, Mr. Tipton is limited to carrying out simple, routine tasks and semi-complex routine tasks in an environment that does not involve fast paced work or requirements to meet specific production quotas. (*Id.*) Any change to work procedures or tasks must be occasional and explained in advance. (*Id.*)

The ALJ found that Mr. Tipton was unable to perform his past relevant work as a photo finish photographer. (Tr. 31.) She found that he was 35 years old on the alleged disability onset date and had at least a high school education. (*Id.*)

The ALJ then concluded that—considering Mr. Tipton's age, education, work experience, and RFC—there were jobs that existed in significant numbers in the national economy that he could perform, including the work of a "merchandise marker" (DOT 209.587-034), "small product assembler" (DOT 706.684-022), or "routing clerk" (DOT 222.687-022). (Tr. 32.) Accordingly, the ALJ determined that Mr. Tipton was not disabled. (*Id.*)

## V.  LAW & ANALYSIS

### A.  Standard of Review

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r*

*of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 Fed. Appx. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g).

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (cleaned up) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The standard for "substantial evidence" is "not high." *Id*. While it requires "more than a mere scintilla," "[i]t means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (quoting *Consolidated Edison*, 305 U.S. at 229).

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, . . . a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an

accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)) (alteration in original).

### B.     Standard for Disability

Consideration of disability claims follows a five-step review process. 20 C.F.R. § 416.920. First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990) (quoting 20 C.F.R. §§ 404.1520(c) and 416.920(c)).

Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. § 416.920(d).

Before considering Step Four, the ALJ must determine the claimant's residual functional capacity, *i.e.*, the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. 20 C.F.R. § 416.920(e). An RFC "is the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 416.945(a)(1). Agency regulations direct the ALJ to consider the functional limitations and restrictions resulting from a claimant's medically determinable impairment or combination of impairments, including the impact of any related symptoms on the claimant's ability to do sustained work-related activities. *See* Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 at *5 (July 2, 1996).

19

"A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner." *Golden v. Berryhill*, No. 1:18CV00636, 2018 WL 7079506, at *17 (N.D. Ohio Dec. 12, 2018), *report and recommendation adopted sub nom*, 2019 WL 415250 (N.D. Ohio Feb. 1, 2019). The ALJ is "charged with the responsibility of determining the RFC based on [the ALJ's] evaluation of the medical and non-medical evidence." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013). "[T]he ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support [the ALJ's] decision, especially when that evidence, if accepted, would change [the ALJ's] analysis." *Golden*, 2018 WL 7079506 at *17.

At the fourth step, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 416.920(e)–(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, the claimant is not disabled if other work exists in the national economy that the claimant can perform. 20 C.F.R. § 416.920(g). *See Abbott*, 905 F.2d at 923.

###### C.   Analysis

In his assignment of error, Mr. Tipton contends that the ALJ erred when evaluating the medical opinion of Mr. Wisner, a treating physician assistant. Specifically, he argues that the ALJ failed to properly explain the supportability and consistency factors before concluding that the opinion was unpersuasive.

In his July 10, 2024 questionnaire opinion, Mr. Wisner identified that he had seen Mr. Tipton yearly for 20 years and had diagnosed him with type I diabetes and major depressive disorder. (Tr. 1948) He identified the prognoses of both conditions as "good." (*Id.*) He identified that Mr. Tipton has bilateral shoulder pain with decreased range of motion and crepitus. (*Id.*) When asked how often pain could be expected to interfere with Mr. Tipton's concentration and attention

on the job, Mr. Wisner marked, "Constantly." (Tr. 1949.) Mr. Wisner indicated that psychological conditions, including depression, anxiety, and panic, were affecting Mr. Tipton's physical condition. (*Id.*) Mr. Wisner indicated that Mr. Tipton could "rarely" tolerate high stress work, moderate stress work, and low stress work. (*Id.*) When asked how many city blocks Mr. Tipton could walk without severe pain or rest, Mr. Wisner wrote, "Rarely." (*Id.*)

Mr. Wisner opined that Mr. Tipton could sit for 45 minutes at a time before needing to get up. (*Id.*) He could stand for 45 minutes at a time before needing to sit down or move around. (*Id.*) But Mr. Wisner marked that Mr. Tipton could not sit or stand for more than two hours total in an eight-hour workday. (Tr. 1950.) And Mr. Wisner marked that Mr. Tipton would need to walk every five minutes, for five minutes at a time. (*Id.*) Mr. Wisner indicated that Mr. Tipton would need to shift positions at will throughout the workday. (*Id.*) Mr. Wisner further opined that Mr. Tipton would need to take an unscheduled, 20-minute break every hour. (*Id.*)

Mr. Wisner wrote that Mr. Tipton's legs should be elevated to "knee level" for 50 percent of the workday. (*Id.*) He can rarely lift and carry up to 10 pounds and can never carry 20 pounds or more. (*Id.*) He can occasionally look up and down, turn his head left or right, or hold his head in a static position. (Tr. 1951.) He can never stoop, crouch, or climb ladders, and he can only rarely climb stairs or twist. (*Id.*) He has significant limitations with handling and fingering. (*Id.*) He can never reach his arms overhead; he can engage in twisting for 40 percent of the workday and in fine manipulations for 40 percent of the workday. (*Id.*) He is likely to be absent about four days per month. (*Id.*)

The ALJ discussed Mr. Wisner's opinion as follows:

> The opinions of Robert Wisner, PA . . . are not persuasive. First the undersigned notes that while PA Wisner opined to these limitations in July 2024, the record lacks any recent treatment records. He further reports he sees the claimant only annually. Despite seeing the claimant only yearly, he

21

reports significant limitations related to both the claimant's physical and mental impairments, despite any regular treatment for those impairments. Furthermore, his extreme limitations are not well supported. For instance, he opines the claimant could sit for only 45 minutes at a time, and less than 2 hours in an 8-hour day. However, his only physical diagnosis is type I diabetes with "good" prognosis. He states the claimant is rarely capable of even low stress jobs due to panic and depression. However, the record lacks any recurring medical visits or emergency visits for panic attacks. His only inpatient stay was for suicidal ideation. He opines the claimant would need to elevate his legs to knee level for 50% of the day. Yet records lack any evidence of edema, or the need for lower extremity elevation. He opines the claimant can only occasionally look down, turn his head, look up or hold his head in a static position, but the record lacks evidence of any significant cervical spine conditions. Accordingly, his opinions lack almost any objective support whatsoever, and are therefore unpersuasive.

(Tr. 30–31.)

The SSA considers opinions from medical sources under five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors, such as familiarity with other evidence in the claim or with the disability program's policies and evidentiary requirements. 20 C.F.R. § 404.1520c(c).

Section 404.1520c(b)(1) specifically provides that "it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [the ALJ] considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record." 20 C.F.R. § 404.1520c(b)(1).

Of the five factors, supportability and consistency are the most important, and an ALJ must explain how the ALJ considered them. 20 C.F.R. § 404.1520c(b)(2). The ALJ "may" but "is not required to" explain how the ALJ considered the remaining factors. *Id.*

The "supportability" factor looks to how well the medical source supports the opinion with objective medical evidence from the record. See 20 C.F.R. § 404.1520c(c)(1). "In other words, the supportability analysis focuses on the physicians' explanations of the opinions." *Lavenia v.*

22

*Comm'r of Soc. Sec.*, No. 3:21cv674, 2022 WL 2114661, at *2 (N.D. Ohio June 13, 2022) (quoting *Coston v. Comm'r of Soc. Sec.*, No. 20-12060, 2022 WL 989471, at *3 (E.D. Mich. Mar. 31, 2022)).

The "consistency" factor looks to how consistent the medical opinion is with evidence from other medical and nonmedical sources. See 20 C.F.R. § 404.1520c(c)(2). "As long as the ALJ discussed the supportability and consistency of the opinion and supported [the ALJ's] conclusions with substantial evidence within his decision, the Court will not disturb [the ALJ's] decision." *Njegovan v. Comm'r of Soc. Sec.*, No. 5:21-CV-00002-CEH, 2022 WL 1521910, at *4 (N.D. Ohio May 13, 2022).

With respect to supportability, Mr. Tipton argues that the ALJ did not adequately discuss supportability because she "largely disregarded the potion of the opinion dealing with limitations from [his] shoulder impairments." Mr. Tipton directs the Court to an October 2020 appointment with Mr. Wisner, in which Mr. Wisner noted a long history of shoulder pain that had not been remedied by more conservative measures. (Pl's Br., ECF No. 6, PageID# 2023–24.)

After careful consideration, I disagree that the ALJ failed to adequately address supportability. First, the ALJ accurately notes that, overall, Mr. Wisner's only specifically identified objective evidence for his opined limitations were diagnoses of diabetes and major depressive disorder, both of which had a "good" prognosis. The ALJ reasonably found that these diagnoses alone to provide little support for the disabling exertional and other physical limitations Mr. Wisner identified—including limitations related to his shoulder.

Moreover, the ALJ identified that Mr. Wisner's opined limitations were inconsistent with his own treatment records. While it is true that the ALJ did not specifically identify, in this section of the decision, those of Mr. Wisner's own treatment records that are inconsistent with his opinions,

23

it is clear that the ALJ considered Mr. Wisner's own treatment records and found them to be inconsistent with the opinions.

An ALJ adequately addresses supportability where the ALJ discusses the medical source's treatment records earlier in the decision, even if the ALJ does not specifically reference supportability when evaluating the medical source's opinion. *See Guthrie v. Comm'r of Soc. Sec.*, No. 3:22 CV 1309, 2023 WL 6258259, at *3 (N.D. Ohio Sept. 26, 2023) (holding that ALJ adequately addressed supportability by reviewing in detail evidence on which state agency psychologists relied); *Bradley v. Comm'r of Soc. Sec.*, No. 1:23-cv-00082, 2023 WL 8529099, at *8 (N.D. Ohio Dec. 8, 2023) (holding that remand was not warranted where decision, read as a whole, showed that ALJ adequately considered supportability of opinion).

Among other things, earlier in the opinion, the ALJ had noted that Mr. Wisner at a July 2023 appointment assessed that Mr. Tipton had normal range of motion generally, and specifically had normal range of motion in the cervical back. (Tr. 26, citing Tr. 961.) The ALJ then noted in this section of the decision that "the record lacks evidence of any significant cervical spine conditions." The ALJ thus found that Mr. Wisner's opinion that Mr. Tipton can only occasionally look down, turn his head, look up or hold his head in a static position was unsupported.

The same can be said of Mr. Wisner's opinion that Mr. Tipton needs to elevate his legs. The ALJ accurately noted that the medical records (including Mr. Wisner's treatment records) lack any evidence of edema or the need for lower extremity elevation.

Before moving to consistency, I note that Mr. Tipton's specific supportability argument—which is directed at his shoulder limitations—betrays why the ALJ's analysis of supportability was adequate and supported by substantial evidence. In discussing supportability of the opinion overall, the ALJ noted that Mr. Wisner's 2024 opinion was based only on yearly examinations, with no

24

recent treatment records among the evidence. (Tr. 30.) Mr. Tipton, in arguing that the opined shoulder limitations are well supported, directs the Court only to an appointment with Mr. Wisner from 2020—before Mr. Tipton underwent shoulder surgery. But at an appointment with Mr. Wisner in August 2022, Mr. Tipton had normal range of motion. (Tr. 617.) And at an appointment with Mr. Wisner in July 2023, Mr. Tipton had normal range of motion. (Tr. 961.)

Where Mr. Wisner based his extreme, disabling limitations on (at best) his own yearly examinations, which themselves revealed normal range of motion after surgery, the ALJ reasonably concluded that those opinions are not supported by the objective evidence.

I turn next to Mr. Tipton's arguments regarding the consistency factor, which is where he focuses his assignment of error. Mr. Tipton first takes issue with the ALJ's conclusion that Mr. Wisner's opinion on low stress work was inconsistent with the record evidence. Mr. Tipton points out that the ALJ's reasoning was that "the record lacks any recurring medical visits or emergency visits for panic attacks" and "[h]is only inpatient stay was for suicidal ideation." (Tr. 30.)[2] Without contesting the accuracy of that statement, Mr. Tipton points to the records from psychiatric appointments in November 2020 (Tr. 420), September 2021 (Tr. 424), December 2021 (Tr. 471), and October 2022 (Tr. 475) as well as the December 2023 inpatient treatment (Tr. 1532). He notes that he continued to follow up with psychiatry after January 2024 (Tr. 1888) and in April 2024 reported that he was upset that his marriage was "falling apart" and said he had reduced motivation. (Tr. 1879–80.)

The ALJ's decision must be read as a whole. *Taylor v. Kijakazi*, No. 1:20-cv-01121, 2021 WL 4477865, *8 (N.D. Ohio Sept. 30, 2021). And "the Commissioner's decision cannot be

---

[2] Contrary to Mr. Tipton's argument (ECF No. 6, PageID# 2024), the ALJ did not "require inpatient treatment." The ALJ's statement is reasonably read as an observation that Mr. Tipton did not seek frequent, or even routine, medical treatment for panic attacks—let alone emergency treatment.

overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). A reviewing court may not "try the case de novo, nor resolve conflicts in evidence, nor decide questions of credibility." *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quoting *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984)); *see also Anderson v. Comm'r of Soc. Sec.*, No. 1:21-CV-1471, 2022 WL 4545188, at *2 (N.D. Ohio Sept. 29, 2022) ("it is also well-established that as long as the ALJ cites substantial, legitimate evidence to support the conclusion reached, the reviewing court may not second-guess that decision").

Here, the ALJ discussed Mr. Tipton's mental health treatment history throughout his decision. The ALJ acknowledged Mr. Tipton's brief inpatient hospitalization for suicidal ideation in 2023 but noted that Mr. Tipton's "remaining treatment has been largely conservative and infrequent." (Tr. 23.) The ALJ accurately noted that Mr. Tipton frequently did not follow up for up to a year at a time, and when he did, his examinations generally were fair. (Tr. 22–23.) The ALJ then discussed Mr. Tipton's treatment history in detail when explaining her RFC decision. (Tr. 26–27.)

Mr. Tipton does not point to any inaccuracy in the ALJ's recitation of the evidence. He instead suggests that *other* evidence in the record, namely those appointments identified above, were consistent with greater limitations. (ECF No. 6, PageID# 2024.) This is merely a request to reweigh the evidence.

It is true that Mr. Tipton reported in November 2020 that he had "worsened since starting Effexor," as he argues. (*Id.*) But he had worsened because he misplaced his medicine and had not been taking it, consistent with the ALJ's recitation of the evidence. (Tr. 421.) And even then, he

had not had panic attacks or suicidal ideation and was merely restarted on a different medicine. (*Id.*)

It is true that Mr. Tipton restarted treatment in September 2021 and was noted to have difficulty enjoying things, racing thoughts, and low appetite. (Tr. 424.) But it was also noted that Mr. Tipton had not been to the office in nearly a year; he reported that he had run out of his medication and never made a follow up appointment. (*Id.*) Again, even off medication he reported no panic attacks or crying spells or feelings of worthlessness or suicidal ideation. (*Id.*) And again, he was merely restarted on his medication and referred for psychotherapy. (Tr. 425.)

In December 2021, Mr. Tipton reported that he is not doing well, and reported panic attacks, but again he had discontinued taking his medication in the interim. (Tr. 471.) And again, he was merely restarted on a different antidepressant medication. (Tr. 472.)

He did not follow up at six weeks, as requested, instead waiting until October 2022. (Tr. 475.) He again reported that he had not been compliant with his medications, and he also reported significant life stressors that brought him back to seek treatment—a "family feud and multiple stressors at home" with which he was having difficulty coping. (*Id.*) And even in that stressful situation, Mr. Tipton was not prescribed further medication but rather offered psychotherapy and referred for marriage counseling. (Tr. 476.) His demeanor on examination was "calm and collaborative," and he spoke with a normal pitch and volume. (Tr. 475.)

Mr. Tipton did not seek mental health treatment again until his hospitalization in December 2023. (Tr. 1532.) After medication adjustment subsequent to that encounter, he was "brighter and smiling," reporting a good response to the medication and saying his anxiety had stabilized. (Tr. 1888.) Even in the extremely stressful situation where he felt his marriage was "falling apart," Mr. Tipton reported that the medication was controlling his anxiety, he was calm on examination,

27

he was able to collaborate with his provider, and he was merely continued on his medication with instructions to follow up in four weeks. (Tr. 1881–82.)

In sum, I do not view any of the examples Mr. Tipton identified as contradicting the ALJ's recitation of the record evidence. I do not find any reversible error in the ALJ's finding that Mr. Tipton's treatment history is inconsistent with Mr. Wisner's opinion that Mr. Tipton cannot perform even low-stress work. *See Offord v. v. Comm'r of Soc. Sec.*, No. 5:21-2257, 2022 WL 2717026, at *14 (N.D. Ohio July 13, 2022) (ALJ reasonably considered a long gap in treatment, conservative levels of medication and counseling, and improvement in mood and stress tolerance upon treatment, in rejecting a medical source opinion). I am confident that that conclusion is supported by substantial evidence.

Mr. Tipton next argues that the ALJ erred when considering the consistency of Mr. Wisner's opinions regarding his shoulder impairments. He points to the 2020 pre-surgery evaluation discussed above. (Tr. 383.) He points out that he continued to follow up with injections, and had abnormal physical examination findings, until his surgery. (Tr. 387, 389, 392, 398, 760.) He also points out that he continued to report stiffness after the surgery. (Tr. 712, 661.) He further points out that he reported pain, including in his right shoulder, which was worst when reaching overhead or behind his back. (Tr. 608.) Finally, he points out that he continued to undergo injections and continued to have some abnormal findings on examination. (Tr. 561, 585–86, 609, 953–54, 965.)

This, again, is merely a request to reweigh the evidence. The ALJ thoroughly and accurately summarized the treatment record related to Mr. Tipton's shoulder impairments. (Tr. 25.) In doing so, the ALJ noted that he had decreased range of motion before the surgery, but after the surgery he did not complain of any pain or discomfort, except for some tightness with reaching

28

overhead or behind. (*Id.*) Even in February 2021, after shoveling snow, his pain level was only a one out of ten. (*Id.*)

Mr. Tipton did not follow up for shoulder pain until August 2022, and the ALJ summarized how the pain was diagnosed as an impingement and treated successfully with injections, such that as of July 2023 he did not require another injection. (*Id.*) While the ALJ acknowledged that he continued to have reduced range of motion, he had full strength and normal testing except for the cross-body adduction. (*Id.*) And the ALJ noted that the record contains little or no complaints in 2024 with respect to shoulder pain. (*Id.*)

Here again, I do not view any of the examples Mr. Tipton identified as contradicting the ALJ's recitation of the record evidence. I do not find any reversible error in the ALJ's finding that Mr. Tipton's treatment history is inconsistent with Mr. Wisner's opinion that Mr. Tipton would be constantly distracted by pain at work, can rarely lift any weight at all, can only occasionally move his head in any direction, can never reach overhead, and can only engage in fine manipulations or grasping for 40 percent of the workday. To the contrary, I am confident that that conclusion is supported by substantial evidence.

Finally, Mr. Tipton argues briefly that the ALJ's rejection of his neck limitations was erroneous because in April 2020 an examination revealed reduced range of motion in the neck as a result of his shoulder condition. (Tr. 385.) This argument is meritless. The April 2020 examination before his surgery, and—as discussed further above—examinations subsequent to the surgery revealed normal range of motion in the cervical spine, and even Mr. Tipton's remaining shoulder discomfort did not seem to be related to flexion of the neck. There is no error in finding Mr. Wisner's opined limitations, with respect to Mr. Tipton's ability to move his head, inconsistent with the record evidence.

29

Accordingly, because the ALJ adequately addressed the supportability and consistency of Mr. Wisener's opinions, and because the ALJ's conclusions are supported by substantial evidence, I recommend that the Court overrule Mr. Tipton's assignment of error.

## VI.   RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court AFFIRM the Commissioner's final decision.

  Dated:  June 30, 2026                                    /s/ *Jennifer Dowdell Armstrong*
                                                           Jennifer Dowdell Armstrong
                                                           U.S. Magistrate Judge

## VII.   NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

> **Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a <u>de novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878–79 (6th Cir. 2019).